IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

David P.[1],

       Plaintiff,                           Civ. No. 3:17-cv-00836-MC

       v.                                   OPINION AND ORDER

Commissioner of the Social Security
Administration,

       Defendant.
_____

MCSHANE, Judge:

Plaintiff David P. brings this action for judicial review of the Commissioner's decision denying his application for disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

Plaintiff alleges disability as of July 31, 2011, mainly from limitations from back pain and symptoms from psychological impairments. After a hearing, the administrative law judge (ALJ) determined Plaintiff was not disabled. Tr. 34.[2] Because the ALJ erred in rejecting the opinions of the treating psychologist and therapist, the Commissioner's decision is REVERSED and this matter is remanded for calculation of benefits.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party in this case.
[2] "Tr." refers to the Transcript of Social Security Administrative Record, ECF No. 12, provided by the Commissioner.

1 – OPINION AND ORDER

## BACKGROUND

Plaintiff worked for many years as a carpenter. None of those jobs lasted long, usually because Plaintiff simply could not get along with others. *See* Tr. 70 (Plaintiff's longest job was two years and before that job, Plaintiff never worked even one year at any company); *see also* Tr. 71 ("Yeah, I've lost jobs because of my personality, or however you want to put it, the way I am."). Back pain, along with the economic downturn in 2008, resulted in Plaintiff becoming unemployed. Plaintiff's unemployment soon led to homelessness. Homeless and unemployed, Plaintiff lacked healthcare insurance until July 2013. Tr. 598.

In January 2013, Plaintiff began, albeit reluctantly, to seek help and treatment for his psychological issues. All told, over the next three years, Plaintiff had over 100 therapy sessions at Clackamas County Behavioral Health. In mid-2014, a friend allowed Plaintiff to stay at his home. Plaintiff's mental health treatment, coupled to some extent with his stable housing, led to a slow increase in Plaintiff's functioning. In 2014, Plaintiff began taking a few community college classes. Plaintiff's progress, set-backs, and the opinions of his treating providers are laid out in great detail below. Plaintiff's treating providers stated that as of September 2015, Plaintiff's symptoms rendered him unable to perform any full-time job.

In September 2015, Plaintiff appeared at a hearing before the ALJ. On March 2, 2016, the ALJ concluded Plaintiff was not disabled under the Act. The ALJ rejected the opinions of Plaintiff's mental health providers, opting to give greater weight to the opinions of one examining psychologist and two reviewing psychologists. Plaintiff timely appealed.

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record.

42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

## **DISCUSSION**

The Social Security Administration utilizes a five step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920 (2012). The initial burden of proof rests upon the claimant to meet the first four steps. If claimant satisfies his or her burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner's burden is to demonstrate that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id.*

The ALJ found Plaintiff had the RFC to perform light work, but that Plaintiff could not perform work involving teamwork or work that involved public interaction or anything more than superficial interaction with coworkers. The ALJ found that the Plaintiff could remember, understand, and carry out tasks or instructions consistent with occupations of Specific Vocational Preparation 1 or 2. Tr. 25. In making that finding, the ALJ relied heavily on the opinions of the

3 – OPINION AND ORDER

reviewing psychologists, while giving little weight to the opinions of Plaintiff's treating and examining psychologists.[3] Tr. 30-32. Plaintiff contends "that he is too fragile to successfully perform substantial gainful activity (SGA) on a sustained, routine basis." Pl.'s Brief, 1-2. As demonstrated below, the treating psychologists, who knew Plaintiff's symptoms and capabilities best, agreed. The question here is whether the ALJ erred in according more weight to the reviewing psychologists' opinions than to the opinions of the treating (and to a lesser extent the examining) psychologists.

Where there exists conflicting medical evidence, the ALJ is charged with determining credibility and resolving any conflicts. *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. . . ." *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Generally, a treating doctor's opinion is entitled to more weight than an examining doctor's opinion, which in turn is entitled to more weight than a reviewing doctor's opinion. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). The opinions of treating sources are generally entitled to controlling weight, as "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

---

[3] As discussed below, the ALJ gave great weight to the opinion of Dr. Johnston, who examined Plaintiff on May 16, 2013, the same month Dr. Rappaport began treating Plaintiff. The ALJ largely rejected the opinion of Dr. Alvord, who examined Plaintiff in April 2015 and found greater limitations than those recognized by Dr. Johnston.

4 – OPINION AND ORDER

Plaintiff's treating providers agreed that as of September 10 2015—although Plaintiff had improved over the course of 33 months of therapy—he remained too fragile to perform any full-time work. Given the complexities of his symptomology and impairments, Plaintiff's treatment history requires detailed consideration as set forth below.

Plaintiff established care with Clackamas County Behavioral Health on January 28, 2013. Tr. 617. At that time, Plaintiff "cusses every other word" in an attempt to mask stuttering. Tr. 617. In that initial assessment, Plaintiff appeared with:

> Visible physical tic movements throughout the assessment, with his arm moving, in an involuntary manner from time to time. ADHD – Disorganized and tangential on varied topics. Struggles explaining things to people, rapid, pressured speech, hyperactive, since he can remember. Difficulty tracking topics, non-linear speech and thought patterns, but this also appears to be his regular speech pattern and has been the same, by his report, throughout his lifetime. . . . Currently, Homeless. Stays at a friend's house now and again, more so since he's been sick, but he needs to figure something out.

Tr. 617.

Objectively, Plaintiff presented as:

> friendly, agitated, hyperactive at times, mostly cooperative, but did question how services would "help" him. . . . Exhibited evidence of rapid, tangential thoughts, thoughts were logical, thoughts were non-linear and would regularly digress, with David not sure what he was talking about, or what topic brought him to that specific place, regularly needed redirections. David's [sic] presents as manic, although it appears more in line with historical patterns related to ADHD, Combined, hyperactive/impulsive. Rapid rate appears his normal speaking pattern, and is reported as such.

Tr. 620.

On March 12, 2013, Plaintiff attended his first individual therapy session with Evan Danehy, LPC. Tr. 637. Danehy met with Plaintiff regularly over the following two years. One of the many goals of therapy was to improve Plaintiff's social skills. Early on, Danehy noted Plaintiff "expresses frustration at how others interact with him. He is moderately tangential

5 – OPINION AND ORDER

throughout the session, and has a hard time maintaining concentration." Tr. 644. "Dave appears to feel a high level of frustration in regards to how he can appropriately behave among people he doesn't know well, and feels as though he is often unable to interact in a fashion that is well received." Tr. 644. Plaintiff's severe difficulty in interacting with others is well documented throughout the record. On April 11, 2013, Danehy noted:

> Dave's distress level continues to rise, along with an increased difficulty concentrating. This seems to correlate to his continued medical issues and homelessness. If he is able to commit to a long-term recovery plan he is likely to see a decrease in these symptoms that are negatively affecting his daily functioning.

Tr. 647.

Beginning in May 2013, psychologist Michael Rappaport, MD began meeting with Plaintiff, both for therapy and medication management. Tr. 653-54. Dr. Rappaport noted, "Pt was seen for the first time today as a complex case requiring more time than usual to discern the potential usefulness and discuss the relative risks versus benefits of medication as an adjunct to therapy." Tr. 654. On that date, Dr. Rappaport observed Plaintiff's "speech is rapid, his tone is elevated. He at times is able to recognize that aggression in his voice and lowers his rate and tone of speech but overall is agitated, frustrated and annoyed at CCBH staff . . . ." Tr. 655.

These initial observations by Daheny and Dr. Rappaport correlate with other observations from medical professionals at that time. The record demonstrates that in early 2013, Plaintiff was highly unstable. On January 2, 2013, Plaintiff attempted to establish care with a primary care physician. The Certified Physician's Assistant (PA) noted Plaintiff's conversation was "very tangential," he "is argumentative and suspicious with all questions asked" and "appears very agitated and irritable." Tr. 509. Spending over 45 minutes with Plaintiff, Tr. 512, the PA noted:

> PSYCH: Speech is rapid and tangential. Mood is suspicious, anxious and depressed. . . . Speech: loud, pressured, rapid, shouting, stuttering and swooping or exaggerated intonations., Mood: Angry, Distrustful, Hostile and Irritable., Flight of ideas with derailed and circumstantial language. Coherency and relevance of thought: Blocking, Circumstantial, Flight of ideas and Tangential., Thought Content: Suspicious. . . . Attention and concentration: Short attention span. . . . Judgment: Insight is fair and Judgment is poor.

Tr. 511. Plaintiff was so agitated, the PA suspected drug use. Tr. 512. The PA "Advised complete mental health evaluation immediately at Centerstone. . . . Concern that patient may require extensive services (psychiatry, behavioral and social) and may be better served at Clackamas County facility." Tr. 512. In addition to recommending mental health treatment, the PA "strongly recommended" that Plaintiff utilize other available services "as I feel strongly that patient needs advocate to navigate healthcare and other social services in addition to mental health." Tr. 514.

As noted above, Plaintiff began utilizing services provided by Clackamas County Behavioral Health later that month. Tr. 617. Plaintiff took advantage of individual mental health therapy sessions with Danehy and Dr. Rappaport during the following three years. Additionally, as noted by the PA, Plaintiff required more than therapy. Plaintiff needed an advocate to navigate both the healthcare system in general, and everyday problems made more difficult by Plaintiff's impairments. Luckily, Clackamas County Behavioral Health provided Case Management services in addition to mental health services. There are hundreds of notes detailing phone calls between Plaintiff and his case manager. Often times, Plaintiff simply needed help with seemingly routine things. Tr. 634 (documenting phone call where Plaintiff stated, "I need primary care established and I need records of my care to be sent for my presumptive care application. Can you help?"). Other times, the case manager helped Plaintiff secure a bus pass. Tr. 636. Plaintiff's symptoms turned these mole hills into mountains. Early on, the case manager

observed that Plaintiff "does not present in crisis at this time, but he does seem to be on the verge of crisis. He is couch-surfing, is dealing with a combination of complicated medical issues, and feels 'rejected' by society." Tr. 642. Incredibly, at this time Plaintiff reported "feeling at least 50% more stable that at the start of treatment . . . ." Tr. 642.

With the aid of mental health therapy, Plaintiff gradually improved over the next few years. The notes document Plaintiff's feelings of being viewed as an outcast as well as his "chaotic life" and feelings of disorganization. Tr. 638. Many of Plaintiff's problems stemmed from his "frustration at how others interact with him." Tr. 644. Danehy:

> worked with Dave on coming up with stress management techniques he could use when feeling distressed, particularly when there is a high level of stimulation in/around him, or in times of extreme isolation. Specifically, we brainstormed ideas of how he can either appropriately leave a situation or appropriately engage. . . . Dave appears to feel a high level of frustration in regards to how he can appropriately behave among people he doesn't know well, and feels as though he is often unable to interact in a fashion that is well received.

Tr. 644.

In May 2013, Dr. Rappaport began treating Plaintiff. Tr. 653-54. By August 2013, Plaintiff reported his medications resulted in a decrease in his ADHD symptoms, and stability with insurance and housing led to his overall mood being more stable. Tr. 677.

In March 2014, Danehy "worked with Dave to explore the pros and cons of entering into this new dynamic with school, especially in terms of his worries about attention-deficit issues that surfaced this semester taking just one class." Tr. 796. One month later, Plaintiff reported "struggling with attending school full time." Tr. 798. He "reports feeling overwhelmed by the demands on his focus and energy levels now that school has begun." Tr. 798.

As is typical with an individual engaged in mental health therapy, Plaintiff did not experience linear progress. By May 2014, Dr. Rappaport noted Plaintiff's "Mental status appears

8 – OPINION AND ORDER

to be improved over his baseline of 6 months ago" and medications appeared to control his ADHD symptoms. Tr. 803. In June 2014, Danehy noted "Dave continues to have stressors in his life that impact his mood and stability, and he appears to be developing tools to help mitigate those symptoms. Using them consistently will be key in determining whether or not he continues progressing in treatment." Tr. 807. Specifically, "increased challenges at school recently, which have triggered disproportionate trauma-related responses about his capability and identity." Tr. 807.

After a few months of slow progress, by December 2014 Plaintiff regressed due to his struggles around school, finances, and housing. Tr. 827. At this point, his insecurity led to Plaintiff often not wanting to leave the house. Tr. 827. Two years into treatment, Danehy offered this assessment in January 2015:

> Dave's mood has shown consistent decline over the course of the last year, and recently. He meets criteria for Dysthymic D/O as he continually suffers from low mood, low motivation, increased tearfulness, and lack of desire to engage in pleasurable activity. He also continues to be treated for ADD symptoms, as his concentration level is low, albeit improved from a year ago. Dave also continues to use marijuana daily, although reports recently having cut back substantially.

Tr. 782.

Dr. Rappaport opined Plaintiff "may be experiencing a depressive episode, with anxiety, secondary to [Social Anxiety Disorder]." Tr. 830. In May 2015, Danehy noted Plaintiff's frustration regarding "his inability to engage more with others or in the community," and concluded "Dave is not making significant progress in managing his mood while his motivation level remains so low." Tr. 1276. By July 2015, Danehy commented:

> Dave reports an increase in depressive symptoms, including isolation, hopelessness, and agitation stemming primarily from news that he won't be able to have surgery to fix the main issue with his back. He is also currently struggling in a CCC math class which jeopardizes his well laid out plan in school. . . . Dave

9 – OPINION AND ORDER

> was tearful when discussing the change in schedule with therapy appts, stating that it was "really difficult" for him to wait a month to come in because of his perceived inability to "really talk" to others in his life. . . . Dave appears to have suffered a bit of a setback with his mood due to the distressing medical news he received.

Tr. 1279.

In April 2015, Scott Alvord, PsyD conducted a psychological evaluation of Plaintiff. Dr. Alvord commented:

> It is noteworthy, at this point, that records reviewed by this author, do highlight the fact that other providers and his attorney, have experienced him as quite defended and it is suspected by other clinicians that he has a history of downplaying his history of childhood abuse/psychiatric trauma. Throughout our encounter, he did make statements suggesting that he believes that admitting to abuse or other psychiatric symptoms for that matter may be a reflection of weakness.
>
> It is further noteworthy that he appeared to become somewhat more forthcoming with this author as the evaluation progressed. This is consistent with records reviewed by this author that do suggest that he "takes awhile to warm up."

Tr. 1267.

During the examination, Plaintiff "demonstrated a combination of physically manifested anxiety and hyperactivity believed secondary to ADHD. Tr. 1269. Below are Dr. Alvord's complete diagnostic impressions:

> As a result of clinical interview, a review of available records, and administration of the psychological testing measures outlined prior, the following diagnostic impressions are provided. Generally, [Plaintiff] is judged to be an individual suffering from chronic ADHD as well as reported Tourette's Disorder. I also see evidence of an underlying Anxiety Disorder and certainly maladaptive personality traits have contributed to his functional limitations over the years.
>
> While symptoms of a personality disorder are often disregarded as applied to disability, it is emphasized that maladaptive character traits can, and in Mr. Parrish's situation, certainly contribute to social, academic and emotional impairment. He has a clear history of affective intensity and instability/lability that has alienated relationships and contributed to occupational strife; he lacks impulse control. His interpersonal functioning is awkward, lacks trust/emotional

10 – OPINION AND ORDER

reciprocity and is clearly off-putting to peers, bosses and, as noted prior, individual[s] to who he turns for help (such as his attorney and this author).

Given the information at my disposal, it is considered as likely as not that his current psychiatric symptoms have existed at their current level of severity since 2008; personality features have likely been present since early adolescen[ce]. As is often the case with similar individuals, his psychiatric symptoms may be progressing as his ability to cope with his limitations (physical) and external stressors such as finances increase. Even with ongoing psychiatric treatment, he continues to present as symptomatic.

Admittedly, diagnostic clarification for Mr. Parrish is complex. He does have a history of some success occupationally and is primarily complaining of physical issues as impacting his ability to work now, although again, it is clear that he has a history of underlying anxiety, and the nature of his treatment, including prescriptions for neuroleptic medications, and stimulant medications, further adds complexity to diagnostic clarification. And, as outlined above, he has a clear tendency to downplay psychiatric features either due to limited insight, or again, symptoms of a personality disorder. In other words, his inability to articulate his psychiatric limitations due to poor insight should not discredit the severity of his symptoms. It is noted that ongoing cannabis use is not considered material to his current limitations. In fact, I suspect use of cannabis is beneficial as a means of lessening anxiety, alleviating pain complaints, etc. Complete abstinence from cannabis is unlikely to lesson psychiatric symptoms.

He should be monitored for increasing mood symptoms, especially in the domain of suicidal ideation. His prognosis is guarded.

Tr. 1271-72.

Dr. Alvord opined that while Plaintiff would have no difficulty performing simple and repetitive tasks, he would have difficulty performing detailed tasks, accepting instructions from supervisors, interacting with co-workers or the public, performing activities on a consistent basis without special instructions or accommodations, and dealing with usual stress encountered in the workplace. Tr. 1272.

On September 10, 2015, Dr. Rappaport and Danehy offered their own opinions regarding Plaintiff's limitations. Tr. 1263-65. As noted, when they offered their opinions, Dr. Rappaport and Danehy had treated Plaintiff for nearly three years. During that time, Danehy had over 50

11 – OPINION AND ORDER

individual therapy sessions with Plaintiff while Dr. Rappaport had 24 individual therapy sessions with Plaintiff. In addition, the record contains notes from nearly 40 group sessions Plaintiff attended at Clackamas County Behavioral Health. Dr. Rappaport and Danehy worked at Clackamas County Behavioral Health and of course had access to the notes from Plaintiff's group sessions. I note the length of Dr. Rappaport and Danehy's treating relationship with Plaintiff, in their areas of expertise, only to emphasize the ALJ's clear error in disregarding their opinions (and Dr. Alvord's) in favor of the opinions of the reviewing psychologists.

Dr. Rappaport and Danehy agreed that while Plaintiff had improved during treatment, he remained fragile:

> [Plaintiff] has improved over the 2+ years that he has been with Clackamas County. When he first came, he was pressured, intense, argumentative, and suspicious. [He] communicated in a loud, somewhat aggressive voice. His Tourette's tics were obvious. In the evaluation process, he expressed intense frustration at being judged by others, labeled as a meth addict, and written off as not worthy of attention or help.
>
> Over the years you have been treating him, as your relationship has matured, his presentation has also mellowed. He now understands that you have his best interests at heart, and relies on your treatment to help keep him more level. He has been able to get into a stable living situation which has also tremendously helped his mood. However, because he is living with a friend, he is always worried his situation will change, and he would again be homeless. If he lost his housing, it would destabilize him. He is stable but very fragile.

Tr. 1263-64.

While Plaintiff was successful in school, his treating providers believed this success was due to his current stability in treatment, the external structure imposed by the educational environment and special assistance from tutors, the special accommodations Plaintiff received (in the form of breaks during class and ability to record lectures), and other support from his treatment providers. Plaintiff did his homework alone and "is too fragile to really engage" with

other students socially. Tr. 1264. Dr. Rappaport and Danehy believed Plaintiff lacked "the capacity to succeed in his schoolwork AND engage with others socially, due to his organizational problems and poor understanding of social conventions." Tr. 1264. As for Plaintiff's limitations, Dr. Rappaport and Danehy opined:

> If [plaintiff] was in a work place that had production demands, was fast paced, involved repetitive work, pressure, criticism, strained relationships with co-workers, or dealing with the general public his symptoms would increase. When [Plaintiff] is stressed, his already compromised executive functioning worsens, leading to a vicious cycle of inability to prioritize, concentrate or maintain focus, increased irritability, anger and lashing out impulsively. His anxiety would increase and with that, his tics would intensify, drawing even more unwanted attention. When his anxiety goes up, his capacity to deal with any of the stresses of the workplace, including interpersonal relations, boredom, repetitive work, production demands, etc. goes way down. He would likely be "off task" until he was able to calm down in a less demanding environment. He could not deal with critical or overbearing supervisors. He is prone to reacting impulsively, saying things that could be (unknowing to him) inflammatory, but then quickly forgetting that he said them, being unaware of the negative impact of his words on others and being completely unprepared to redress them. You said that he might be able to sustain part time data entry work but would be hampered by inattention in doing repetitive tasks. You do not think he would be able to sustain any type of full time work. Due to his physical problems, he needs to change positions frequently. He was much more limited when you first began treating him, with the intense, argumentative presentation described above.

Tr. 1264.

The ALJ summarized the opinions of Dr. Rappapport and Danehy, including their belief that Plaintiff "would not be able to sustain any type of full-time work." Tr. 31. The ALJ's entire reasoning for giving little weight to these opinions consisted of, "they are not given significant weight because they make a number of speculative predictions about how the claimant would react that are not clearly supported by the evidence. Little weight is given to the statement as to

position changes, as Dr. Rappaport is a psychiatrist."[4] Tr. 31. This statement, especially considering "the evidence" as to Plaintiff's mental limitations, is meaningless. All medical opinions as to a patient's limitations from impairments are "speculative predictions." Doctors, especially in the social security context, are expected to make "speculative predictions" as to a claimant's abilities. Indeed, this is the entire role of reviewing and examining physicians in social security cases. Additionally, "the evidence" regarding Plaintiff's mental limitations consists nearly entirely of the session notes from Plaintiff's 100+ therapy sessions at Clackamas County Behavioral Health. Dr. Rappaport and Danehy based their opinions on these notes, along with their own observations of Plaintiff over tens of individual therapy hours over nearly three years. And while Plaintiff's daily activities are relevant, Dr. Rappaport and Danehy were well aware of these activities, including the fact that Plaintiff attended Community College. Dr. Rappaport and Danehy expressly commented on Plaintiff's success in college, and gave reasons for why that limited success (in a structured environment with multiple accommodations) would not translate into success in any full-time job. Tr. 1264.

      Rather than follow the opinions of those professionals who treated Plaintiff over the course of several years, the ALJ gave great weight to the opinions of the reviewing psychologists. These reviewing psychologists, like all reviewing physicians, examined the available record and made "speculative predictions" as to the claimant's abilities. The reviewing psychologists, just like Dr. Rappaport and Danehy, offered their opinions on the question of whether Plaintiff could perform simple tasks and get along even in a superficial manner with coworkers and supervisors, day in and day out on a sustained basis. Ultimately, the reviewing

---

[4] Although Plaintiff alleged limitations due to back pain, I need not address those arguments as the psychological evidence and opinions clearly demonstrate Plaintiff's symptoms render him unable to perform any full time work. The focus here is on the ALJ's rejection of Dr. Rappaport's opinions as to Plaintiff's mental limitations.

14 – OPINION AND ORDER

psychologists opined that by restricting Plaintiff to limited public contact and coordination with coworkers, Plaintiff could work in a job requiring only simple tasks.

But there is a reason treating physicians' opinions, both objective and subjective, are entitled to "special weight." *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989). (quoting *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1989)). Treating physicians are in the best position "to know and observe the patient as an individual." *Id.* (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).This is especially true in cases turning solely on a claimant's mental impairments. The treating providers each agreed Plaintiff would be unable to hold down any full-time job. Essentially, despite improving with therapy, Plaintiff remained fragile and his condition was one where added stress from a workplace would result in a decreased ability to function (in the form of failure to maintain concentration or lashing out at coworkers or supervisors due to lack of impulse control). Tr. 1264. Those opinions, from a psychologist and LPC who each treated Plaintiff in numerous individual therapy sessions over nearly three years are, by far, the best evidence available as to what exactly Plaintiff is capable of. In studying the opinions and treatment notes of the psychologists, it becomes clear that substantial evidence does not support the ALJ's decision giving great weight to the reviewing psychologists' opinions while simultaneously rejecting the opinions of the treating psychologists.

I note that in a case involving mental limitations, only under rare circumstances will an ALJ be justified in rejecting the opinion of a treating psychologist who based that opinion on 24 individual therapy sessions with the Plaintiff (and on notes from over 75 other therapy sessions) in favor of a reviewing or examining psychologist. This case is not such a rare case.

The ALJ's error is magnified when considering the complex nature of Plaintiff's psychological impairments. Everyone who saw Plaintiff in person, from the PA who met

15 – OPINION AND ORDER

Plaintiff when he established care, to Dr. Alvord, Dr. Rappaport, and Danehy, commented that Plaintiff's symptoms were "complex." Additionally, Plaintiff's symptoms differed greatly from early 2013 (when he was homeless and just beginning treatment) to September 2015 (when Plaintiff was somewhat stabilized, attending Community College, and undergoing regular therapy sessions). But the reviewing psychologists formed their opinions in May 2013 and January 2014. Tr. 30. Dr. Johnston examined Plaintiff in May 2013. Dr. Rappaport did not even begin treating Plaintiff until May 2013. Tr. 653-54. As of May 2013, given the complexity of Plaintiff's symptomology, there was little evidence of Plaintiff's mental limitations. The ALJ erred in giving great weight to the reviewing psychologists—who never observed Plaintiff and lacked access to nearly all the evidence of Plaintiff's mental impairments and treatment—and to an examining psychologist who saw Plaintiff on one occasion at the start of Plaintiff's therapy, over the opinions of Dr. Rappaport and Danehy who collectively treated Plaintiff during 75 individual therapy sessions over the course of nearly three years and whose opinions aligned so closely to their own treatment notes.

In the Ninth Circuit:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits. More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004); *see also Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).

Credited as true, the opinions of Dr. Rappaport and Danehy demonstrate Plaintiff was unable to sustain any full-time employment as of September 2015. Because on remand the ALJ would be required to find Plaintiff disabled, remand for an award of benefits is appropriate.[5] *Benecke*, 379 F.3d at 593.

## **CONCLUSION**

The ALJ erred in rejecting the opinions of Dr. Rappaport and Danehy. Credited as true, those opinions demonstrate Plaintiff was disabled from July 31, 2011 through September 2015. The Commissioner's decision is REVERSED and this matter is remanded for calculation of benefits.

IT IS SO ORDERED.

DATED this 25th day of September, 2018.

   /s/ Michael McShane
Michael McShane
United States District Judge

---

[5] Dr. Rappaport and Danehy agreed Plaintiff had improved between early 2013 and September 2015. Nothing in this opinion should be read to prevent the agency from considering whether, after September 2015, Plaintiff's condition improved to the point he was no longer disabled under the Act. 42 U.S.C. § 423(f)(1).

17 – OPINION AND ORDER